IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ISRAEL JACOB TORRES,            :
                                :
        Plaintiff               :
                                :       CIVIL NO. 1:CV-10-1323
    vs.                         :
                                :        (Judge Caldwell)
SECURITY CAPTAIN T. P. CLARK,   :
*et al.*,                       :
                                :
        Defendants              :


*M E M O R A N D U M*

I.    *Introduction*

        The *pro se* plaintiff, Israel Torres, brings this suit pursuant to 42 U.S.C. §

1983 alleging First, Eighth and Fourteenth Amendment violations by various prison officials.

Named as defendants are the following SCI-Frackville prison employees: Superintendent

Wenerowicz; Security Captain T. P. Clark; Classification Program Manager S. K. Kephart;

and Hearing Examiner (HEX) Sharon Luquis.

        Plaintiff makes the following claims: (1) Capt. Clark violated his First

Amendment rights when he issued him a retaliatory misconduct for writing a letter to a

friend containing protected speech about CO Blankenhorn; (2) Torres' placement in the T-

Cell (a cell separate from the RHU cells and located in the psychiatric observation area)

was in retaliation for the same First Amendment protected speech; (3) HEX Luquis violated

his due process rights during the course of his misconduct hearing by denying him the

opportunity to question Capt. Clark; and (4) defendants violated his Eighth Amendment

rights when they failed to remedy the unsanitary and unhealthy conditions of his

confinement in the T-Cell which caused him blurry vision, sleep deprivation, and an

aggravation of his mental-health condition.

This matter comes before the court on defendants' motion for summary judgment. Defendants' motion will be granted as the summary-judgment evidence establishes the following. First, Torres was not issued a retaliatory misconduct. Capt. Clark did issue him a misconduct for writing his letter but the letter did not contain protected speech. To the contrary, it contained unprotected speech, a threat against CO Blankenhorn. In other respects, the retaliation claim lacks merit. Second, the due process claim fails because Plaintiff failed to properly exhaust his administrative remedies in respect to his misconduct hearing. Third, the conditions-of-confinement claim (which also contains an Eighth Amendment medical claim) for his placement in the T-Cell fails in part because: (1) he also did not properly exhaust his administrative remedies on this claim; (2) he has not shown Defendants' deliberate indifference; and (3) the claim in some respects lacks merit.

II.    *Standard of Review*

Under Fed. R. Civ. P. 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In deciding a motion for summary judgment, "[t]he court need

consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Meditz v. City of Newark,* 658 F.3d 364, 369 (3d Cir. 2011)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)(citing *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510).

At summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. *Liberty Lobby*, 477 U.S. at 256-57, 106 S.Ct. at 2514. "[T]he non-moving party must rebut the motion with facts in the record." *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). Allegations made without evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000).

III.   *Background*

The record evidence, viewed in the light most favorable to the non-moving party, reveals the following undisputed facts relevant to the disposition of the instant motion.

*First Misconduct Hearing - March 9, 2010: Misuse of the Mail*

At all times relevant to this action, Torres was incarcerated at SCI-Frackville. (Doc. 65, Defs.' Statement of Undisputed Material Facts (DSMF) at ¶ 1).  Capt. Clark is the Security Captain at SCI-Frackville.  (*Id.* ¶ 2).  In that role, he supervises all of the activities associated with SCI-Frackville's Security Office.  His duties include, but are not limited to, intelligence gathering, investigations, drug interdiction efforts, search team activities, coordination of the search of employee/volunteers, selection of inmate cells for random searches, Security Threat Group (STG) monitoring,[1] inmate telephone monitoring, closed circuit television monitoring, evidence control and maintenance of the confidential sources of information (CSI) files.  (*Id.* ¶ 3).

On March 2, 2010, Torres was housed in SCI-Frackville's Restricted Housing Unit (RHU) on disciplinary status with an expected RHU release date of July 20, 2010. (Doc. 65-1, ECF p. 12).  On March 2, 2010, the Security Office intercepted a piece of Torres' outgoing non-privileged correspondence addressed to Ms. Patricia Chistakoff.  (*Id.*) The envelope contained two letters, one for Ms. Chistakoff, and a second letter that Torres instructed Ms. Chistakoff send to her nephew, "Shizz."  (*Id.*)  Prison officials identified

---

[1] Security Threat Group issues address gang-related activity within prisons.  *See* DSMF ¶ 7.

"Shizz" as inmate Shawn Colon who is housed at SCI-Houtzdale.  (*Id.*)  After reading the letters and conducting an investigation, CO Blankenhorn issued Torres a misconduct on four charges: misuse of the mail, refusing to obey an order regarding correspondence between inmates without DOC approval, possession of contraband, and engaging in or encouraging unauthorized group activity because the letter to Shizz was STG in nature.[2] The letter instructed Shizz to remain loyal to the Bloods while in prison.  (*Id.*, ECF pp. 12-13).

Torres pled guilty to two of the four misconduct charges.  Following a misconduct hearing on March 9, 2010, before HEX Luquis, Torres was found guilty on all charges and given 90 days' additional disciplinary custody time.  (Doc. 65-1, ECF pp. 14-18).

> *Second Misconduct Hearing - March 25, 2010: Letter Threatening*
> *Blankenhorn and Using Abusive Language*

On March 22, 2010, Torres penned a second letter to Ms. Chistakoff.  (Doc. 65-1, Mar. 22, 2010, letter, ECF pp. 9-10).  In this letter, Torres advised Chistakoff that he had not received her recent letter because prison officials confiscated it believing it contained STG material, "in other words it was gang related."  (*Id.*, ECF p. 9).  He noted that "with me everything is STG . . . It's that cocksucka Blankenhorn again. . . But I don't worry to (sic) much about him because he's just a subordinate with limited authority . . . He probably been (sic) a subordinate all his life and repeatedly got his ass kicked in school by the class nerd."  (*Id.*)  In a "P.S." to his letter to Ms. Chistakoff, Torres wrote:

---

[2]  Torres is recognized by the PA DOC as a member, and possible leader, in the "West Coast Bloods, Piru Nation".  (*Id.*, ECF p. 16).

> That fagette (sic) Blankenhorn is so desperite (sic)
> that he is searching everyone's mail who's in the
> R.H.U. in hopes of finding something with my
> name on it especially those who I accociate (sic)
> myself with . . . If he keep's acting like he is above
> policy/law somebody is going to break his jaw is
> what I assume?!

(*Id.*, ECF p. 10).

On March 25, 2010, Capt. Clark issued Torres Misconduct Report B187325 making two charges: (1) threatening an employee or their family with bodily harm; and (2) using abusive, obscene, or inappropriate language to an employee.  (Doc. 65-1, misconduct report, ECF pp. 7).  Capt. Clark had reviewed Torres' letter to Ms. Chistakoff in accordance with DC-ADM 803, the DOC's Inmate Mail and Incoming Publications directive. (*Id.*)  As the institution's Security Captain, Capt. Clark believed issuing Torres a misconduct for his threat to CO Blankenhorn was necessary to preserve internal order and discipline and to maintain institutional security.  (DSMF ¶ 8).  As written by Capt. Clark, the misconduct report focused on the following language from the letter:

> "It has come to my . . . that a letter was received into this jail
> from you but personally I did not receive it. . . It's that cocksucka
> Blankenhorn." and "That fagette Blankenhorn is . . . searching
> everyone's mail . . . if he keeps acting like this . . . someone is
> going to break his jaw."

(Doc. 65-1, ECF p. 7).

There is a factual dispute about whether Plaintiff knew when he wrote the March 22 letter that his mail was being reviewed by C.O. Blankenhorn before it was sent out of the institution.  Capt. Clark affirms that on March 4, 2010, he advised Torres that "CO Blankenhorn was monitoring [his] mail to Patricia Chistakoff" because of the previous misconduct where Plaintiff had used Chistakoff to forward letters to other inmates.  (Doc.

65-1, Clark Decl. ¶ 3, ECF p. 3).  Torres admits that Clark interviewed him on March 4, but denies that he was ever told that CO Blankenhorn would be monitoring his outgoing mail. (Doc. 77-2, Torres Decl. ¶ 1, ECF p. 39).  He also denies CO Blankenhorn's accusation that he was secretly sending letters to other inmates within SCI-Frackville.  (Doc. 77-2, ECF p. 67).

There is also a factual dispute about whether Clark or Blankenhorn intercepted the March 22 letter.  Clark affirms that Blakenhorn had intercepted the letter while he was inspecting Plaintiff's outgoing mail.  (Doc. 65-1, Clark Decl. ¶ 4, ECF p. 3). Plaintiff maintains that Clark was monitoring his mail and that Clark intercepted and read the letter, as alleged in paragraph 8 of his amended complaint and admitted to by the defendants in their answer.  (Doc. 29, Am. Compl. ¶ 8, and doc. 34, Answer ¶ 8).

On April 1, 2010, HEX Luquis conducted a misconduct hearing on Misconduct Report B187325.  (Doc. 65-2, misconduct report, findings of fact, ECF p. 2).  Luquis noted that she "allowed Mr. Torres the opportunity to question Capt. Clark [at the hearing], however, Mr. Torres informed HEX that he ha[d] no questions for Capt. Clark at [that] time." (*Id.*).  Ms. Luquis found that Plaintiff knew his mail was being monitored by CO Blankenhorn and that he would have read the statements in the letter.[3]  She found Torres guilty of "threatening an employee or their family with bodily harm" and "using abusive,

---

[3] Torres disputes that Ms. Luquis read the letter.  He asserts that she instead relied on Capt. Clark's version of the letter. (PSDF ¶ 6).  This dispute is not material.  A review of the letter, Capt. Clark's misconduct report, and the statements attributed to him by Ms. Luquis in her findings of fact regarding the letter establishes that Ms. Luquis described the contents of the letter accurately.  *Compare* Docs. 65-1 , ECF p. 7 (Misconduct Report B187325), pp. 9-10 (Torres' letter) and Doc. 65-2, ECF pp. 2-3 (Disciplinary Hearing Report on Misconduct Report B187325). Moreover, we note that although Torres now disputes whether HEX Luquis read the actual letter, he previously stated in his amended complaint that she had "read the letter that Plt wrote to his friend which led to the misconduct . . ."  *See* Doc. 29 at ¶ 13.

obscene, or inappropriate language to an employee." (DSMF ¶ 11; *see also* Doc. 65-2, ECF pp. 2-3). Torres was sanctioned with an additional 60 days in the RHU for the threat charge and an additional 30 days for the abusive language charge. (Doc. 65-2, misconduct report, ECF p. 3); (DSMF ¶ 12).

Aside from offering his testimony at the misconduct hearing, Capt. Clark did not consult with HEX Luquis regarding her findings with Torres' misconduct. (DSMF ¶ 13). Likewise, he did not determine the sanction or penalty Torres received. (*Id.*)

*T-Cell Placement*

Torres was housed in the RHU before his second disciplinary report charging him with writing an abusive and threatening letter in regard to C.O. Blankenhorn. (DSMF ¶ 14). After his misconduct hearing on those charges, Clark transferred Torres to a transition cell, or T-Cell, in the "SSNU." (DSMF ¶ 15).[4] The T-Cell is designed to be both a Psychiatric Observation Cell (POC) and a security-based Transition Cell (T-Cell). (DSMF ¶ 18). When used as a T-Cell, it is governed by local Transition Cell Post Orders, and placement is determined by the Shift Commander. (*Id.*) The primary purpose for placing an inmate in the T-Cell is for security reasons such as: isolation for investigative purposes, dry cell purposes, behavioral management for problematic, non-committable inmates, isolation for medical reasons such as street PV in need of clearance; or other purposes as determined by the Shift Commander.[5] (*Id.*)

---

[4] Defendants do not identify what the SSNU is.

[5] Torres contends defendants produced no documentation of any investigative reports, behavior reports or psychiatric reports as to why he was placed in the T-Cell in their response to his request for production of documents. *See* Doc. 78, ECF pp. 4-5; Doc. 77-2, ECF pp. 53-54.

(continued...)

Capt. Clark placed Torres in the T-Cell due to concerns that Torres may attempt to use other inmates in the RHU to send and receive letters. (DSMF ¶ 19). Capt. Clark did not escort Torres to the T-Cell. (*Id.* ¶ 16). Ms. Luquis is not responsible for maintaining cells and does not decide which particular cell an inmate is placed in within the RHU after they are sanctioned with time in the RHU. (*Id.* ¶ 17; Doc. 65-1 , ECF p. 4; Doc. 65-1 , ECF p. 22). Ms. Luquis did not observe the conditions of Torres' T-Cell. (DSMF ¶ 17).

Torres was housed in the T-Cell for six days, from April 1 to April 7, 2010. He claims that on April 2, 2010, during a visit from Superintendent Wenerowicz, he complained of "blotchy vision" and sleep deprivation. (Id. ¶ 21). On April 5, 2010, Torres was seen by Nurse Haggerty and complained of back pain, vision problems, and dandruff. (*Id.* ¶ 22; *see also* Doc. 65-2, ECF p.10). He also reported a decrease in the amount of sleep due to being placed in the T-Cell. (*Id.*) The nurse scheduled Torres to be seen by the physician that day. Torres was seen on April 5, 2010, by the physician. (DSMF ¶ 23). The only complaint Torres voiced at that time related to his dandruff. (*Id.*) The physician prescribed Torres dandruff shampoo. (*Id.*)

On April 20, 2010, about two weeks after his release from the T-Cell, Torres requested the institution's psychiatrist to increase his psychotropic medication due to

---

[5](...continued)
Specifically, he argues Defendants failed to produce documentation indicating why the Shift Commander placed him in the T-Cell on April 1, 2010. *Id.* However, Torres misrepresents his discovery request. As Defendants pointed out in their response, Torres' request ("Please produce any other purposes determined by the shift commander as to why plt. was placed in the T-Cell") called for an answer and was not a proper document request. Therefore, there can be no inference from Defendants' response to Plaintiff's document discovery that the shift commander was unaware of, or failed to approve, Capt. Clark's request to place him in the T-Cell. *Id.*

issues related to his stay in the T-Cell.  (Doc. 77-2, ECF pp. 61-62).  Torres claimed that "at the time [he] did have thoughts of hurting [him]self.  But [he] fought it and made it threw (sic) without causing [him]self harm."  (*Id.*)  He requested help in getting his "psychosis back to normal."  (*Id.*)  As a result, Torres' Doxepin was increased for a two-month period. (Doc. 65-2, ECF p. 12, Physician's Order Form).

### *Grievance Proceedings*

On March 27, 2010, Torres filed a grievance pursuant to the DOC's DC-ADM 804,[6] claiming that Capt. Clark issued him the second misconduct report in retaliation for the statements made in his March 22 letter about C.O. Blankenhorn, which Plaintiff asserted were merely venting his frustration over prison life.  (DSMF ¶ 25; Doc. 65-2, inmate grievance form, ECF p. 14).  The institution's Grievance Coordinator rejected the grievance, noting that as it was misconduct related, he must make his challenge via DC-ADM 801, not DC-ADM 804.[7]  (DSMF ¶ 26; Doc. 65-2, ECF p. 16).

On April 5, 2010, Torres resubmitted his grievance via DC-ADM 804 asserting not only that Capt. Clark's misconduct report was retaliatory but also that the decision to place him in the T-Cell was retaliatory.  The grievance also challenged his conditions of confinement while he was in the cell.  (DSMF ¶27; Doc. 65-3, ECF pp. 2-3).  He claimed he was forced to sleep on a hard plastic slab instead of a mattress, which caused him lower

---

[6] The Pa DOC has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement.  37 Pa. Code § 93.9(a); *see also* http://www.cor.state.pa.us, DC-ADM 804, *Inmate Grievance System Policy.*

[7] An inmate found guilty of a misconduct cannot utilize the Inmate Grievance System, DC-ADM 804, to challenge the misconduct determination or sanction.  Instead, the inmate must pursue his remedies under the procedures set forth in DC-ADM 801, the Inmate Discipline policy.  *See* http://www.cor.state.pa.us, DC-ADM 801, *Inmate Discipline.*

back pain.  He also complained that the 24-hour lighting in the cell caused him "blotted vision and sleep deprevation (sic)."[8]  (*Id.*)

On April 7, 2010, the Grievance Coordinator again rejected Torres' grievance because it contained two separate issues, one relating to his cell assignment and the other dealing with the reason for placing him in the T-Cell.  (DSMF 28; Doc. 65-3, ECF p. 5). Torres was advised that "[d]ue to it being separate issue[s] you will need to file a different grievance regarding those issues."  (*Id.*)

On April 7, 2010, Torres appealed the rejection of his grievance to Superintendent Wenerowicz.  (Doc. 65-3, ECF pp. 7-8).  Again, Torres claimed Capt. Clark placed him in the T-Cell for retaliatory reasons and that he was forced to sleep on a hard plastic slab, unable to control the lighting in his cell, which led to "blotted vision" and "much trouble getting any sleep" for the six days he was confined in the T-Cell.  (*Id.*; DSMF ¶ 29). On April 13, 2010, Superintendent Wenerowicz denied the appeal on the ground that the issues raised concerned his misconduct, which he must address through DC-ADM 801 and not the grievance process.  (DSMF ¶ 30; Doc. 65-3, ECF p. 10).

On April 21, 2010, Torres filed his final appeal with the Chief Grievance Officer, again complaining of the conditions of his confinement (no mattress/constant illumination) as well as the alleged retaliatory nature of the misconduct which resulted in his confinement in the T-Cell.  (DSMF ¶ 31; Doc 65-4, ECF pp. 2-3).  On June 9, 2010, the

---

[8]  In his amended complaint, Torres claims he was deprived of his standard clothing, legal materials, family pictures, personal property, yard time and showers while in the T-Cell.  (Doc. 29, ECF p.3).  He states he was required to lay on a hard plastic slab instead of a mattress and the bright illumination in the cell was constant.  *Id.*  He also claims there was "old blood splattered on the walls, and dried feces on the floor and door (partially on the feeding slot)."  *Id.*

Chief Grievance Officer rejected Torres' grievance for two reasons.  First, it complained about separate incidents which had to be presented in separate grievances.  Second, that aspect of the grievance challenging Capt. Clark's misconduct report had to be appealed using the procedures specified in DC-ADM 801.  (DSMF ¶ 32; Doc. 65-4, ECF p. 5).

### Misconduct Appeal Proceedings

On April 4, 2010, Torres filed a misconduct hearing appeal pursuant to DC-ADM 801.  (Doc. 65-4, ECF pp. 7-8).  Although he checked the box indicating that his appeal was based, in part, on his claim "the procedures employed were contrary to law, Department directives or regulations," he failed to specify any alleged procedural deficiencies by HEX Luquis in his appeal.  (*Id.*)  Likewise, he did not allege any such deficiencies in his appeal to Superintendent Wenerowicz.  (Doc. 65-4, ECF pp. 12-13).  Rather, his misconduct appeal claimed he was issued a retaliatory misconduct for his letter to Ms. Chistakoff.  (DSMF ¶ 33; Doc. 65-4, ECF pp. 7-8).

In his administrative misconduct appeal, Torres defended his use of the threatening language in his letter to Ms. Chistakoff, claiming merely to be sharing in confidence with Chistakoff his frustrations and opinions.  (Doc. 65-4, ECF p. 7).  He noted that "[a] prison guard is always at risk & chances himself to be assaulted by prisoners every time he or she comes to work, therefore an opinion such as the one [he] made does not breach security . . . nor will it cause a minor or major disruption to everyday prison life." (*Id.*)

On April 14, 2010, the Hearing Review Committee sustained the misconduct on the basis that it was within the Hearing Examiner's purview to make a determination of

credibility between Torres and Capt. Clark.  Furthermore, the Hearing Review Committee found that Torres' sanction was within the guidelines for the type of misconduct in which he had engaged.  (DSMF ¶ 34; Doc. 65-4, ECF p. 10).

On April 18, 2010, Torres appealed his misconduct result to Superintendent Wenerowicz.  Again he raised the allegations of retaliation and added complaints regarding his T-Cell conditions of confinement.  (DSMF ¶ 35; Doc. 65-4, ECF pp. 12-13). Superintendent Wenerowicz sustained the misconduct on April 28, 2010.  (DSMF ¶ 36; Doc. 65-4, ECF p. 15).  He also noted that Torres failed to include any supportive argument that the evidence was insufficient to support the decision of the Hearing Examiner, or that the punishment he received was disproportionate to the offense, or that the procedures employed were contrary to law — only an allegation that the misconduct was issued in retaliation.  (*Id.*)  The Superintendent noted that between this claim and Capt. Clark's claim that the letter was threatening, the Hearing Examiner was entitled to determine who was more credible.  (*Id.*)

IV.    *Discussion*

A.    *The Retaliation Claim Based on Capt. Clark's Misconduct Report*

1.  *The Retaliation Claim Fails to the Extent It is Based on the Threat Charge Because Torres' Letter Contained a Threat, Not Protected Speech*

A plaintiff alleging a retaliation claim bears the initial burden of showing that: (1) he engaged in a constitutionally protected activity; (2) he suffered "some adverse action" at the hands of a prison official; and (3) "a causal link between the exercise of [the]

-13-

constitutional right[ ] and the adverse action taken." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  Once a plaintiff has made a *prima facie* case, the burden shifts to the defendants to prove by a preponderance of the evidence, that they would have taken the same disciplinary action against plaintiff even in the absence of the protected activity for reasons related to a legitimate penological interest.  *Id.* at 334.  Finally, when analyzing a retaliation claim, it must be recognized that the task of prison administrators and staff is difficult, and the decisions of prisoner officials require deference, particularly where prison security is concerned.  *Id.*

It is well settled that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).  The First Amendment's guarantee of freedom of speech provides protection from censorship of a prisoner's outgoing mail, *Procunier v. Martinez*, 416 U.S. 396, 405-06, 94 S.Ct. 1800, 1807-08, 40 L.Ed.2d 224 (1974), and from censorship of his incoming mail.  *Thornburgh v. Abbott*, 490 U.S. 401, 408, 109 S.Ct. 1874, 1878-79, 104 L.Ed.2d 459 (1989).[9]  See also *Caldwell v. Beard*, 305 F. App'x 1, 4 (3d Cir. 2008)(nonprecedential)("The Supreme Court has recognized that prisoners have protected First Amendment interests in both sending and receiving mail.").  It follows that prison officials may not punish an inmate for statements in outgoing mail protected by the First Amendment.  *Brooks v. Andolina*, 826 F.2d 1266, 1268 (3d Cir. 1987).

"[U]nflattering or unwelcome opinions or factually inaccurate statements" in an

---

[9] *Thornburgh* limited *Martinez* to outgoing mail.  *Thornburgh*, 490 U.S. at 413,109 S.Ct. at 1881.

inmate's outgoing mail are protected by the First Amendment.  *Martinez*, 416 U.S. at 413,

94 S.Ct. at 1811.  But "the legitimate governmental interest in the order and security of

penal institutions justifies the imposition of certain restraints on inmate correspondence."

Id. at 412-13, 94 S.Ct. at 1811.  In the latter regard, what has come to be called "true

threats" have not been considered protected speech in contexts outside the prison setting.

*See Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664

(1969)(interpreting 18 U.S.C. § 871(a), prohibiting threats against the president of the

United States); *Virginia v. Black*, 538 U.S. 343, 359-60, 123 S.Ct. 1536, 1547-48, 155

L.Ed.2d 535 (2003)(interpreting a Virginia statute prohibiting intimidation by cross burning).

> In *Black*, the Supreme Court stated:
>
> "True threats" encompass those statements where the speaker
> means to communicate a serious expression of an intent to
> commit an act of unlawful violence to a particular individual or
> group of individuals.  The speaker need not actually intend to
> carry out the threat.  Rather, a prohibition on true threats
> "protect[s] individuals from the fear of violence" and "from the
> disruption that fear engenders," in addition to protecting people
> "from the possibility that the threatened violence will occur."

*Black*, 538 U.S. at 359-60, 123 S.Ct. at 1536 (internal citations omitted).  The Third Circuit

has stated that "[i]n deciding whether speech constitutes a 'true threat,' a court should

consider the totality of the circumstances and not just the words in isolation, whether the

threat is 'conditional,' and the reaction of the listeners."  *United States v. Fullmer*, 584 F.3d

132, 154 (3d Cir. 2009)(dealing with convictions under the Animal Enterprise Protection

Act, 18 U.S.C. § 43, and the interstate stalking statute, 18 U.S.C. § 2261A(1))(citing and

quoting *Watts*, 394 U.S. at 708, 89 S.Ct. at 1402).  We will use this definition of a true

threat in the circumstances of this case.  *See In re Parmalee*, 63 P.3d 800, 809 (Wash. Ct.

App. 2003)(relying on criminal cases defining a true threat to resolve the plaintiff inmate's claim that language he wrote in a prison grievance was protected by the First Amendment and not a threat as prison officials maintained).

As noted, Torres was charged and punished with 60 days in the RHU for threatening C.O. Blankenhorn when he wrote in his March 22, 2010, letter that if Blankenhorn "keep's acting like he is above policy/law somebody is going to break his jaw is what I assume?!"  This appears to be a true threat, the communication of a serious expression of an intent to commit an act of unlawful violence on an individual.  The communication would have been at least to Capt. Clark as Plaintiff admits he knew that Capt. Clark was reading his mail.[10]  It would also have been reasonable for Capt Clark to react to this language as a serious threat in the prison context.

In opposition, Plaintiff argues it is not a threat given the entire context of the letter, and not just the language Capt. Clark focused on in his misconduct report.  We agree with Plaintiff that some of the language can be construed as venting his frustrations about prison life, and are unflattering (and protected) opinions about Blankenhorn, but an inmate cannot protect a threat by prefacing it with protected speech.

Plaintiff next argues that his threat language innocently "stem[med] from the rumors that were circulating in the RHU about CO Blankenhorn always getting beat up for acting like he is above the law, and how he got beat up 5 times in one year by other

---

[10]  It is therefore immaterial that Plaintiff disputes that Blankenhorn was reading his mail or whether he knew that Blankenhorn was doing so.  In any event, Torres admits in the March 22 letter that Blankenhorn was reading his letters.  That letter states: "[t]hat fagette (sic) Blankenhorn is so [desperate] that he is searching everyone's mail who's in the RHU".  (*Id.*, ECF p. 10).  At the time of the event, given Torres' own language, it can reasonably be inferred that he knew "everyone's mail," including his own, was being monitored.

prisoners." (Doc. 77-2, Opp'n Br., ECF p. 12). We do not think that Plaintiff's explanation for why he made the statement is relevant. *See Parmalee*, *supra*, 63 P.3d at 288-89 (In the prison context, if not in most other settings, a reasonable person would foresee that the statements would be taken as a serious expression of an intention to inflict bodily injury."). In fact, if true, the explanation supports an interpretation of the language as a serious threat as it indicates that Blankenhorn may, once again, be assaulted.

Plaintiff also argues that the letter did not contain a threat because it did not "implicate" Plaintiff in wanting to cause Blankenhorn harm. (Doc. 77-2, ECF p. 12-13). We take this argument to mean that there was no threat because the threat did not include language indicating it would be Plaintiff who would break Blankenhorn's jaw. However, "the fact that a threat is subtle does not make it less of a threat." *Parmalee*, 63 P.3d at 288.

We also note that the conditional nature of the threat does not assist Plaintiff. The threat was conditional because it threatened that Blankenhorn's jaw would be broken, but seemingly only if Blankenhorn continued to act as if he were above policy and law. However, conditional threats can be true threats, *United States v. Kosma*, 951 F.2d 549, 554 n.8 (3d Cir. 1991), and the conditional nature of this threat is irrelevant when it was made in the prison setting.

Plaintiff also argues that the threat language was protected by the First Amendment because it was in outgoing mail to a third party, in which Plaintiff was merely venting to this person about prison conditions, which is preferable to addressing his complaints to a correctional officer and risking a misconduct report. (Doc. 77-2, ECF p.13). We disagree. As noted, Plaintiff knew that Capt. Clark was reading his mail. Thus Plaintiff communicated the threat to Capt. Clark, not just to his correspondent, and Capt. Clark

certainly could not have ignored a threat to a fellow correctional officer.

Finally, Plaintiff argues that the language is protected by the First Amendment by relying on the following cases: *Loggins v. Delo*, 999 F.2d 364 (8th Cir. 1993); *McNamara v. Moody*, 606 F.2d 621 (5th Cir. 1979); and *Bressman v. Farrier*, 825 F. Supp. 231 (N.D. Iowa 1993). These cases are distinguishable because while they all dealt with inmate discipline for comments made in outgoing mail, none of them dealt with threatening language, just language that was abusive, coarse and vulgar.

As Torres himself points out, the environment to which corrections officers expose themselves on a daily basis is inherently dangerous. In his administrative misconduct appeal, he noted that "[a] prison guard is always at risk & chances himself to be assaulted by prisoners every time he or she comes to work . . ." (Doc. 65-4, ECF p. 7). Plaintiff uses this fact as a perverse excuse for his violent language.[11] However, it is all the more reason why threats of violence against correctional officers must be taken seriously.

Because Plaintiff's threat is not protected speech, he fails to satisfy the first prong of the *Rauser* retaliation test since in issuing the threat he was not engaged in the exercise of a constitutional right. Accordingly, defendants are entitled to summary judgment on the retaliation claim to the extent Capt. Clark's misconduct report was based on the threat.

---

[11] As Plaintiff argued in his administrative appeal, "therefore an opinion such as the one [he] made does not breach security . . . nor will it cause a minor or major disruption to everyday prison life," (id.), since presumably one more threat is just part of the background noise.

2.  *The Retaliation Claim Fails to the Extent It Is Based
    on Abusive Language Because Plaintiff Cannot Show a
    Causal Link Between the Letter and the Misconduct Report*

As noted, Plaintiff also received 30 days in the RHU for using abusive, obscene, or inappropriate language to an employee in his outgoing mail, specifically, for writing that Blankenhorn was a "cocksucka" and a "fagette."

In moving for summary judgment on the retaliation claim, Defendants did not specifically address this language, instead arguing that "threats and other inflammatory statements that pose security risks are not protected speech." (Doc. 66, ECF p. 11). It does not appear that abusive and vulgar language can be lumped in with language constituting a threat. *See, e.g, Brooks*, *supra*, 826 F.2d at 1267, 1268 (inmate could not be punished for comment in outgoing mail that female guard "had searched one of his visitors in a very seductive manner"); *Bressman*, *supra*, 825 F. Supp. at 233 (inmate could not be disciplined for comments in outgoing mail calling prison guards "real assholes," a "dick head," "punks," and "bitches").

Unlike that aspect of the retaliation claim based on threatening language, we must therefore move past the first prong of a retaliation claim and see if Defendants' arguments on the second and third prongs entitle them to summary judgment on the language in the letter that was abusive to C.O. Blankenhorn.

As noted above, the second prong requires Plaintiff to show "some adverse action" at the hands of a prison official. *Rauser*, 241 F.3d at 333. To show "adverse action," an inmate must demonstrate that a prison official's actions were "sufficient to deter a person of ordinary firmness" from exercising their constitutional rights. *Allah v. Seiverling*, 229 F.3d 220, 225–226 (3d Cir. 2000). Defendants argue that Plaintiff fails to satisfy the

-19-

second prong because he has not shown that he himself was deterred from exercising his First Amendment rights.  We reject this argument because, as Plaintiff notes, the test is not whether Plaintiff himself would have been deterred but whether a person of ordinary firmness would have been, and more specifically, deterred by placement in the RHU, as Plaintiff alleges as part of the adverse action.  *See Bistrian v. Levi*, ___ F.3d ___, ___, 2012 WL 4335958, at *19 (3d Cir. 2012).

The third prong requires Plaintiff to show "a causal link between the exercise of [the] constitutional right[ ] and the adverse action taken."  *Rauser,* 241 F.3d at 333. Defendants argue Plaintiff cannot satisfy this prong because the evidence shows that Defendants were motivated by legitimate penological interests, the protection of prison order, discipline and security, not by an intent to punish Plaintiff for the exercise of his First Amendment rights for the comments in his letter.

In opposition, Plaintiff argues that a causal link is established by the following: (1) Capt. Clark's falsified misconduct report in which Clark converted what was written in the letter to a threat by not including in the report everything Plaintiff wrote; (2) the unusually suggestive temporal proximity between the letter and the misconduct report; and (3) Plaintiff's placement in the T-Cell immediately after HEX Luquis found him guilty of the misconducts when there was no substantial reason to put him in the T-Cell.  (Doc. 77-2, ECF pp. 17-18).

Plaintiff's three evidentiary points are insufficient to satisfy the third prong.  On his first point, we have already decided that Capt. Clark could properly focus on the language in the letter pertinent to the threat charge and that it is of no legal significance that he did not quote all of the language.

-20-

On his second point, a causal link may be established by evidence of a temporal proximity between the prisoner's protected activity and the defendant's adverse action.  However, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive.  *See Lauren W. ex. rel. Jean W. v. Deflaminis,* 480 F.3d 259, 267 (3d Cir. 2007)(to show a causal connection, a plaintiff must prove "either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.").  The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events.  *See Lape v. Pennsylvania,* 157 F. App'x 491, 498 (3d Cir. 2005)(nonprecedential).

The difficulty for Plaintiff's reliance on temporal proximity is that the timing of the misconduct report is not unusually suggestive of causation in the context of this case.  It is true that the misconduct report was issued within three days of the letter.  However, Plaintiff's letter did make a true threat, so the issuance of a misconduct report within days of the letter would not have been out of the ordinary for proper prison management and does not establish a causal link.

On his third point, Plaintiff provides no evidence that his placement in the T-Cell immediately after HEX Luquis found him guilty was not based on substantial reasons. Indeed, the only  evidence is that Capt. Clark placed him there due to concerns that Torres may attempt to use other inmates in the RHU to send and receive letters.  Plaintiff thus fails to satisfy the third prong of the test.

Based on the foregoing, summary judgment will be granted on the retaliation claim.

-21-

B.   *Torres Failed to Properly Exhaust All Aspects of his Eighth Amendment Conditions-of-Confinement Claim for Confinement in the T-Cell*

Pursuant to the Prison Litigation Reform Act (PLRA), before a prisoner may bring a civil rights action pursuant to 42 U.S.C. § 1983, or any other federal law, he must exhaust all available administrative remedies.  *See* 42 U.S.C. § 1997e; *Porter v. Nussle*, 534 U.S. 516, 524, 122 S.C. 983, 988, 152 L.Ed.2d 12 (2002).  This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122 S.Ct. at 992.  The exhaustion requirement of the PLRA is one of  "proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 84, 126 S.C. 2378, 2383, 165 L.Ed.2d 368 (2006).  This means that the prisoner plaintiff must have completed "the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court."  *Id.*  A prisoner's failure to substantially comply with the procedural requirements of the prison's grievance system will result in a procedural default of the issue and effectively bar the inmate from bringing his claim in federal court.  *Spruill v. Gillis*, 372 F.3d 218, 231–32 (3d Cir. 2004).

In his amended complaint, Torres claims he was deprived of his standard clothing, legal materials, family pictures, personal property, yard time and showers.  (Doc. 29, ECF p. 3).  He states he was required to lie on a hard plastic slab instead of a mattress and the bright illumination in the cell was constant.  (*Id.*)  He also claims there was "old blood splattered on the walls, and dried feces on the floor and door (partially on the feeding

-22-

slot)." *Id.*  However in his grievance, filed while he was still in the T-Cell, Torres only addresses his lack of a traditional mattress which made his back hurt and the 24/7 illumination in the cell which caused him vision problems and sleep deprivation.  (Doc. 65-3, ECF pp. 2-3).

Accordingly, the court cannot consider Torres' claims that the T-Cell was unsanitary or had feces and dried blood smeared throughout, or his alleged lack of clothing, legal or personal property, yard time or showers, as they were not properly raised and exhausted via the DOC's grievance policy or his administrative misconduct appeal.  Thus, Torres' claim that any of the defendants violated his Eighth Amendment rights because of their knowledge and acquiescence in the conditions he endured in the T-Cell or loss of privileges will be dismissed due to plaintiff's failure to properly exhaust these claims.

C.     *Torres Failed to Properly Exhaust His Due Process Claim*

DC–ADM 801, the Inmate Discipline Policy, provides an administrative process for inmates to contest a finding of guilt on a misconduct.  As noted above, claims not raised while the inmate pursues his administrative remedies are procedurally defaulted. *Woodford*, 548 U.S. at 84, 126 S.C. at 2383.  In the context of Torres' misconduct hearing appeal, Torres does not challenge any aspect of the hearing procedures.  (Doc. 65-4, ECF pp. 7-8).  Although Torres claims he was not permitted to question Capt. Clark during his misconduct hearing, he did not raise this claim in his misconduct appeal.  Likewise, he did not raise it when appealing the Program Review Committee's decision sustaining his misconduct sanction.  (Doc. 65-4, ECF pp. 12-13).  Accordingly, Torres' Due Process challenge to the procedures HEX Luquis used during his misconduct hearing is

-23-

unexhausted, and summary judgment will be entered in favor of Defendants on this claim.

        D.      *Torres Fails to Establish an Eighth Amendment Conditions-of-Confinement Claim Nor an Eighth Amendment Medical Claim Related to his Six-Day Stay in the T-Cell*

The Eighth Amendment prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials.  U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The unnecessary and wanton inflictions of pain include "those that are 'totally without penological justifications.'"  *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002)(quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).  However, the Eighth Amendment does not mandate that prisons be free from discomfort.  *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976.

To state a "conditions of confinement" claim pursuant to the Eighth Amendment, a prisoner must establish that he has been deprived of "the minimal civilized measure of life's necessities."  *Young v. Quinlan*, 960 F.2d 351, 359 (3d Cir. 1992). General allegations of harm will not suffice.  *See Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997)(holding that the restrictive conditions in administrative custody in the Pennsylvania state correctional institutions, in and of themselves, do not violate the Eighth Amendment). An allegation that the prisoner has been denied "basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety" from physical assault is required.  *Id.*, 112 F.3d at 709.  Factors to be considered in making this determination include the duration of the inmate's exposure to the condition as well as the "totality of the circumstances."  *Rhodes*, 452 U.S. at 362-63, 101 S.Ct. at 2407.  While some conditions

-24-

alone would not establish an Eighth Amendment violation, conditions in combination may indeed do so.  *See Wilson v. Seiter*, 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In addition to showing conditions that pose a significant risk of serious harm, the inmate must show that the person or persons responsible for the conditions of confinement acted with deliberate indifference.  Deliberate indifference can only be found where a prison official knew of and disregarded an excessive risk to an inmate's health or safety.  *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.  Liability will also be found if it is shown that "the official acted or failed to act despite his knowledge of a substantial risk of harm." *Id.*, 511 U.S. at 842, 114 S.Ct. at 1981.  If the risk of harm is obvious, the existence of the necessary subjective state of mind may be inferred.  *Hope*, 536 U.S. at 738, 122 S.Ct. at 2514.

In order to establish that inadequate medical care has risen to the level of a constitutional deprivation, an inmate must demonstrate that he had a "serious medical need" to which the defendants were "deliberately indifferent."  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).  Moreover, prison administrators cannot be found deliberately indifferent under the Eighth Amendment because they fail to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of prison physicians.  See *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)(holding that non-physician defendants were not deliberately indifferent where they did not respond to the medical complaints of a prisoner who was being treated by a prison doctor)

Torres claims that during his six-day stay in the T-Cell he suffered from back

-25-

pain, vision problems and sleep deprivation due to the lack of a proper mattress and constant cell illumination.  At the outset, to the extent that Torres' conditions of confinement claim rests on the lack of a traditional mattress for six days, the defendants are entitled to judgment on this claim.  It is well settled that the denial of a mattress for a short period of time may be harsh but does not rise to the level of a constitutional violation.  *See Adderly v. Ferrier*, 419 F. App'x 135, 139-140 (3d Cir. 2011)(nonprecedential)(denial of clothing, toiletries, legal mail, mattress and shower for seven days did not constitute Eighth Amendment violation); *see also Milhouse v. Gee*, No. 1:CV-09-2134, 2011 WL 3627414 (M.D. Pa. Aug. 17, 2011)(two-week denial of mattress was not sufficiently serious to rise to the level of an Eighth Amendment violation).  Thus, as a matter of law, the denial of a mattress for six days did not violate Torres' Eighth Amendment rights.

Next we address Torres' claim that his exposure to constant illumination in the T-Cell subjected him to cruel and unusual punishment.  "Requiring inmates to live in constant illumination, under certain circumstances, may rise to the level of an Eighth Amendment violation."  *Brown v. Martinez*, 3:CV–03–2392, 2007 WL 2225842 at *8 (M.D. Pa. July 31, 2007) (citing *Bacon v. Miner*, 229 F. App'x 96 (3d Cir. 2007)(nonprecedential)).  "However, continuous exposure to low wattage night time security lighting may be permissible based on legitimate penological interests, such as prison security concerns." *Id.*

Torres claims that a light, which he could not control, remained on all the time during his six days of T-Cell confinement.  He claims that on April 2, 2010, he told Superintendent Wenerowicz that the light was affecting his vision and his ability to sleep.  On April 5, 2010, Torres was seen two times by medical staff, first by a nurse and then a

physician.  While Torres voiced concerns over his back and vision to the nurse, he failed to raise these complaints with the physician.  On April 5, 2010, Torres received medical treatment for the only complaint he raised with the physician, his dandruff.  Based on these undisputed facts, there are no allegations from which it can reasonably be inferred that defendants were aware of Torres' request for medical treatment that were either ignored or denied.  He has therefore not established an element of his Eighth Amendment claims, deliberate indifference on the part of Defendants.  *See Rode*, *supra*; *Durmer*, *supra*.

Accordingly, Torres has not established that any of the named defendants acted with deliberate indifference or that his conditions of confinement in the T-Cell deprived him of a basic human need.

We will issue an appropriate order.


/s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date: September 27, 2012

-27-

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ISRAEL JACOB TORRES,   :
           :
   Plaintiff     :
           :  CIVIL NO. 1:CV-10-1323
 vs.        :
           :  (Judge Caldwell)
SECURITY CAPTAIN T. P. CLARK, :
*et al.*,         :
           :
   Defendants   :

*O R D E R*

AND NOW, this 27th day of September, 2012, upon consideration of the

Defendants' motion for summary judgment (Doc. 64) it is ordered that:

  1.  The Defendants' Motion for Summary Judgment (Doc. 64)
is granted.

  2.  The Clerk of Court shall enter judgment against Plaintiff
Torres and in favor of Defendants Clark, Kephart, Luquis and
Wenerowicz on all claims against them in the amended
complaint.

  3.  The Clerk of Court shall close this file.

       /s/ William W. Caldwell
       William W. Caldwell
       United States District Judge